**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00667-FYP** |
| **v.** | : | |
| | : | |
| **MAHAILYA PRYER,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Mahailya Pryer to two months of incarceration followed by a three-year term of probation, sixty hours of community service, and $500 restitution.

**I.      Introduction**

Defendant Mahailya Pryer and her co-defendant, Cara Henschel, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on May 18, 2022 (ECF No. 34 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Pryer pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a split sentence of two months of incarceration followed by a three-year term of probation, 60 hours of community service, and a $500 restitution is appropriate in this case because Pryer (1) unlawfully entered the Capitol at the Rotunda Doors, the site of one of the most consequential breaches of the Capitol on January 6, 2021, minutes after a violent breach where police officers were assaulted and the doors' glass panels were smashed; (2) demonstrated a lack of remorse and undermined her involvement in the riot; (3) deleted photographs and videos from her phone and social media accounts that depicted her involvement in the riot; (4) made clear through a post on her codefendant's Facebook account that she was proud of her and her fellow rioters' actions; (5) has a serious criminal history; and (6) has not expressed sincere remorse for her criminal conduct on January 6 .

The Court must also consider that Pryer's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic process of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). Pryer's actions and those of her fellow rioters enabled the breach the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety

of numbers.") (statement of Judge Chutkan). And while Pryer did not directly participate in violence during the riot, she cannot be absolved of culpability because "[l]aw-enforcement officers were overwhelmed by the sheer swath of criminality. And those who engaged in violence that day were able to do so because they found safety in numbers." *See United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, p. 2. From the most mundane actions to the most violent, each rioters contributed directly and indirectly to the violence and destruction of that day, including Pryer.

Here, the facts of and circumstances of Pryer's crime support a sentence of two months of incarceration followed by three-year term of probation, sixty hours of community service, and $500 restitution.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1 (Statement of Facts); ECF No. 34 (Statement of Offense). As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Pryer's conduct and behavior on January 6.

### Pryer's Role in the January 6, 2021 Attack on the Capitol

Pryer, her co-defendant, Hentschel, and two others traveled to Washington D.C. from Missouri to participate in the events on January 6. They attended the "Stop the Steal" rally to protest the results of the 2020 presidential election. Hentschel took photographs of herself and Pryer at the rally. (Image 1.) Days after the riot, Hentschel posted this photograph on her

Facebook and Instagram social media accounts.  Following the rally, Pryer and Hentschel made their way to the Capitol grounds.  In a post-plea interview, Pryer said before the pair entered the Capitol grounds, she saw on social media that rioters were engaged in physical confrontations with law enforcement.  Pryer later changed her statement and said that rioters were only involved in verbal confrontations and were not demonstrating violence.



Image 1

Pryer and Hentschel made their way to the east side of the Capitol building.  A police barricade was toppled in that area, which allowed rioters to ascend the east steps outside of the Capitol in that location.  Pryer and Hentschel gathered with other rioters on the east steps, which led to the Rotunda Doors.  While on the steps and prior to their entry, Hentschel took a photograph of herself on the steps and posted it on her Facebook account on January 6.  (Image 2.)



Image 3

While on the steps, Hentschel also posted a picture of the crowd of rioters on her Instagram account with the caption "Storming the Capitol."  (Image 3.)



Image 4

Pryer admitted to being present with Hentschel on the steps prior to their entry into the Capitol.  In her post-plea interview, Pryer said they made their way to the top of the steps and were protesting.  She said that she took videos and photographs of the riot with her phone, however

deleted before law enforcement could access them.  Pryer also said that she posted some of the photographs and videos on her social media accounts but deleted them by the time law enforcement had identified her.

*The Breach of the Rotunda Doors*

Between 2:25 p.m. and 3:30 p.m. in the afternoon of January 6, the Rotunda Doors were breached three separate times by rioters on the inside and outside of the Capitol building.  The breaches at the Rotunda Doors were some of the most consequential of the Capitol as hundreds of rioters entered the building at that location.  At 2:15 p.m., the doors were secure and undamaged, but the intensity of the crowd of rioters outside of the doors was growing.  At 2:20 p.m., the outside crowd began to bust glass panels from the door.  (Image 5.)  At approximately 2:25 p.m., the first breach of the Rotunda Doors occurred when rioters who are already inside the building opened the doors from the inside.  (Images 6 and 7.) Approximately three minutes later, police officers was able to close the doors again and barricade the doors with benches.  (Image 8.)




| Image 5 | Image 6 |
|---------|---------|

 

Image 7                                    Image 8

Police officers were standing in front of the doors to prevent rioters gathered outside from entering.  The rioters who are already inside the building and in that area begin confronting the officers.  The rioters were first yelling and chanting, but the confrontation soon turned physical. Ten minutes later after the doors were first secured, the second breach occurred at 2:38 p.m. (Image 9.)  During the second breach, the doors are forced open and police officers, who were guarding the doors, were shoved aside, and assaulted.  As a result of this breach, crowds of rioters flooded into the building for the next thirty minutes.



Image 9

7

An open-source video, available on YouTube, captured the breach of the Rotunda Doors at approximately 2:37 p.m. from outside of the doors, when Pryer was present on the east steps of the Capitol and near the doors.[2] From 00:38-01:47 in this video, rioters engage in a heaving maneuver designed to breach the doors while officers are cornered in the entranceway. As they continue to be yelled at, shoved, sprayed with chemical irritants, and struck with flag poles and other objects, the distressed officers bend over and cover their faces to protect themselves. Rioters steal a large riot shield from the officers. Screenshots from the video capture some of the conduct that occurred there, including assaults on the officers cornered in the doorway (circled in white). (Images 10-12.)



Image 10

---

[2] This video is available at https://www.youtube.com/watch?app=desktop&v=MVullQb-Lec.



Image 11



Image 12

At approximately 3:10 p.m., police officers were able to close and secure the doors once again. However, a minute later, the third breach of the doors occurred at 3:11 p.m. as the rioters again overpowered police and rushed in. (Image 13.) At approximately 3:30 p.m. the doors were finally closed and secured. (Image 14.) By then, hundreds of rioters had breached the Capitol through the Rotunda doors and flooded into the building, causing mayhem in their wake.



Image 13



Image 14

*Pryer and Henschel's Entry into the Capitol Building*

Pryer and Hentschel were among the first rioters who entered during the second breach. They entered the doors at 2:43 p.m., five minutes after the second breach began, when shattered glass from the door was strewed on the floor, alarms were blaring, and chemical irritant spray was in the air.  (Image 15.)  When they entered the building, rioters were in physical confrontations with police at the entry way.  In her post-plea interview, Pryer claimed that she had no choice but to enter as they were pushed into the building against their will.  Pryer also made a similar statement featured in the presentence report (PSR) where she wrote that "[w]e really didn't have any choice but to go the way the crowd was going, if we were to turn around we would have gotten trampled."  (ECF No. 39, at ¶ 18.)  However, the video footage documenting their entry demonstrates that they voluntarily entered and were free from duress or force.



Image 15 (Pryer and Hentschel are circled in red)

As discussed in more detail below, Pryer and Hentschel both stated during their interviews that no police officers were present and being assaulted when they entered the building. However, video surveillance from inside of the Rotunda Doors (Image 16 and 17) disputes that contention and show that officers were actively engaged with rioters near the entry way. In Images 16 and 17, Pryer and Hentschel are circled in red and the police officers are circled in white.



Image 16



Images 17

While admitting to seeing glass on the floor, chemical irritant in the air, and people smoking in the Capitol, Pryer said that the rioters' presence was justified because they paid for that building and "it's the people's house." However, Pryer later acknowledged that it was not the proper time to be there. After remaining in the entry area, the pair traveled through adjoining hallways, where Hentschel took a photograph of the chaos. (Image 18.) Hentschel would later share that photograph to others through her Facebook account.



Image 18

Hentschel and Pryer then walked to and around the Rotunda at approximately 2:50 p.m. (Image 19.) Hentschel took a photograph of the Rotunda that she later shared on her social media. (Image 20.)



Image 19



Image 20

The pair then exited the building through the Rotunda Doors at approximately 2:51 p.m.

(Images 21 and 22.)



Image 21



Images 22

*Pryer's Social Media Posts*

As mentioned above, Pryer acknowledged in her post-plea interview that she was active on Facebook and would frequently post personal photographs and political material.  She posted about January 6, including a photograph of herself while in Washington D.C., however she deleted all posts that were related to January 6.  Pryer also took photographs and videos of the crowd outside the Capitol but deleted them from her phone as well.  The Court can reasonably infer that Pryer deleted the materials from her social media accounts and phone to obstruct or impede the investigation or prosecution. But the government and the Court can only speculate about what was in those deleted materials, and speculation is not a proper basis for sentencing.

By contrast, Hentschel's social media posts were preserved and demonstrated many instances where she bragged and boasted about her involvement in the riot in the hours and days that followed.  Hentschel attempted to justify her actions and the actions of her fellow rioters.  In some of her posts, Hentschel implied that the violence and destruction that the riot caused were deserving and warned of future violence.  Records from Hentschel's Facebook account revealed

that Pryer shared Henschel's sentiments.  As part of a Facebook conversation on January 9, 2021,

Pryer wrote:

> Hi I have told many people that yes antifa may have instigated it but it didn't take
> much to piss off already pissed of Patriots.  I am not ashamed of what I have done.
> I am proud of it and I would do it again if it called for it and I will win it does call
> for it.  We have to sacrifice in order to keep our freedom.  It's not supposed to be
> like that but when times call for it we have to.

And Pryer was featured in a photograph of the pair at the rally that Hentschel posted on

January 8, 2021.



Image 23

*Pryer's Interview with the FBI*

Pryer declined to speak with law enforcement during the investigation and at the time of

her arrest.  A person that accompanied Pryer and Hentschel to Washington D.C. pleaded with Pryer

to cooperate with law enforcement during the investigation, but Pryer refused to do so.  In June

2021, the FBI attempted to interview Pryer at her residence.  As is her right, Pryer declined to

provide any information to the FBI, but told the interviewing agents that she did not think that she

had done anything wrong.

After her guilty plea in this matter and pursuant to her plea agreement (ECF No. 33, ¶ 3), Pryer did consent to an interview with the FBI.  During the interview, she explained that she traveled to Washington D.C. with a group of individuals, including Hentschel, to attend the rally on January 6.  After the rally, she went with Hentschel to the Capitol.

Prior to entering Capitol grounds, Pryer initially said that she saw on Facebook that rioters were fighting with the police outside of the Capitol, but she later changed her statement and instead insisted that the social media posts only depicted rioters face to face with law enforcement.

Pryer and Hentschel went to the top of the east steps where they joined others who were protesting. While on the east side she did not see police officers or violence. Pryer claims that she did not intend to enter the Capitol but was pushed into the building by the crowd.  Pryer said that she had no choice in the matter.  Once inside, Pryer saw broken glass, chemical irritants in the air, and people smoking.  Notably, Pryer claimed that she did not see police officers when she entered the building, nor did she see rioters assault police officers or damage property.  She believed she had a right to be there because she, as a taxpayer, paid for the building and that it belongs to the people.

The evidence in this case flatly contradicts any notion that she was an innocent bystander who got pushed into the Capitol by the crowd.  Video footage from the Capitol demonstrates that she had opportunity to leave soon after entering the building, but instead, she walked through halls and the Rotunda.

*The Charges and Plea Agreement*

On September 22, 2021, the United States charged Pryer by criminal complaint with violating 18 U.S.C. § 1752(a)(1), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct

in a Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct on Capitol Grounds; 40 U.S.C. § 5104(e)(2)(G), Parade, Demonstrate, or Picket in any of the Capitol Buildings. On October 4, 2021, she self-surrendered. On November 11, 2021, the United States charged Pryer by a four-count Information with violating the same offenses contained in the criminal complaint.  On May 18, 2022, pursuant to a plea agreement, Pryer pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Parade, Demonstrate, or Picket in any of the Capitol Buildings. By plea agreement, Pryer agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Pryer now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Pryer faces up to six months of imprisonment and a fine of up to $5,000. Pryer must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).

20

Pryer's conduct in the underlying offense as well as her criminal history, lack of remorse, deletion of potentially valuable evidence and disrespect for the laws weigh in favor of a sentence that includes two months of incarceration followed by three-year term of probation, sixty hours of community service, and $500 restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Pryer's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the

defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Pryer personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Pryer is therefore not a mitigating factor in misdemeanor cases, nor does it meaningful distinguish the defendant from most other misdemeanor defendants.  Unlike others, Pryer did not appear to go to Washington D.C. to cause or engage in violence.  However, she was unhappy with the results of the 2020 Presidential election and decided to go the Capitol and ultimately participated in the riot.

Pryer joined the mob of rioters, entered restricted grounds, and ascended the east staircase that led to the Rotunda Doors.  Pryer was among an increasingly agitated and raucous crowd that repeatedly clashed with law enforcement and caused multiple breaches at the Rotunda Doors.

She voluntarily entered the building, then falsely told FBI agents that she did not have a choice in the matter.  Hentschel and Pryer entered the Capitol building minutes after the second breach of the Rotunda Doors.  There were clear signs of violent entry when they entered the building.  The door's glass panes were shattered, and broken glass was on the floor. Alarms sounded and police had been assaulted in that location minutes prior to their entry into the building. When they entered officers were still engaged in confrontations with rioters. After roaming throughout adjoining hallways and the Rotunda, they exited the building.

Finally, Pryer certainly destroyed evidence after the riot as she admitted to deleting videos and photographs from her phone and social media accounts.  Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.   The History and Characteristics of Henschel

As set forth in presentence investigation report (PSR), Pryer's criminal history is troubling and contains criminal convictions over the past decade. Since 2008, Pryer has been convicted of one felony offense and four misdemeanor offenses.   ECF No. 39 ¶¶ 22-26. Her felony offense was for theft when she broke into a vehicle and stole credit cards, U.S. currency, and a check book.   *Id*. at ¶ 25.   She was initially sentenced to four years of probation, but her probation was revoked, and she was imprisoned for 120 days.   *Id*.   She was released from prison and put back on probation, however, she violated her probation again and was sent to prison for three years.   *Id*.   While on probation and parole, she had a stunning 92 violations.   *Id*.   In addition to Pryer's felony conviction, she has misdemeanor convictions for stealing, supplying alcohol to minors, failure to pay child support, and receiving stolen property.   *Id*. at ¶¶ 22-26.   Since her involvement in the riot, she has been arrested on two occasions and has been charged with driving without a license, driving while intoxicated, and leaving the scene of an accident.   *Id*. at ¶¶ 35-36.

Pryer's extensive criminal history, recidivism, difficulty in adhering to the mandates of law enforcement demonstrates that she has little respect for the law.   Pryer's criminal history demonstrates an even more specific deterrence in the form of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37); see also *United States v. Mariposa Castro,* 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 43 ("[I]n order for people to understand that if you're going to engage in the type of behavior that you engaged in, if you're going to make the statements that you made on that day in reference to what was occurring, and if you're going to then disseminate that information to others, there has to be a penalty for it.") (statement of Judge Walton)

Oversight   and   Reform   Committee   (June   15,   2021),   available   at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for specific deterrence for Pryer also justifies incarceration followed by probation. As described throughout this memorandum, Pryer's actions and words in the underlying offense, her criminal history, and a lack of clear remorse indicates that she has a sense of impunity and is indifferent to lawful authority. Pryer has not be dissuaded from engaging in illegal conduct evident by her recent arrests and charges and her other history.

25

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Pryer based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot. Although those like Pryer convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[5]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Pryer has pleaded guilty to 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain

---

[4]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch

of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as co-defendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The government has recommended jail time for defendants who made entry in the Capitol through the Rotunda Doors during the breaches. *United State v. Stacie Ann Hargis-Getsinger*, 21-cr-00607 (EGS) provides a comparable case. Pryer and Hargis-Getsinger were both outside the Rotunda Doors at approximately the same time. They were in a raucous crowd when some rioters assaulted officers, which led to the second breach of the Rotunda Doors. They entered the Capitol at approximately the same time. Hargis-Getsinger's conduct was more egregious than Pryer because the former smoked marijuana in the Capitol and stayed inside longer. On the other hand, Pryer's criminal history is much more extensive than Hargis-Getsinger. Neither of them engaged in violence or destruction. The government recommended 45 days incarceration and three years of supervision to follow. Judge Sullivan imposed a sentence of 60 days incarceration and three years of supervision.

Pryer's criminal history before and after the riot is aggravating and one of the principal reasons for the government's sentencing recommendation. The defendant in *United States v. Robert Bauer*, 21-cr-000049 (TSC), also had an extensive criminal history as Pryer and engaged in similar conduct. Unlike Pryer, Bauer admitted to his conduct days after the riot and voluntarily

agreed to be interviewed by the FBI on two occasions.  The government sought one month in jail in that case and Judge Chutkan sentenced him to 45 days.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

The sentence requested by the government—two months of incarceration followed by 36 months of probation—is a lawful one.  As this Court recognized when imposing such a sentence in *United Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022), a sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3). At least eight other judges of this Court agree. *See United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at

\*1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at \*1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Blakely*, 21-cr-00356 (EGS), ECF 38 (D.D.C. July 14, 2022); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022); *United States v. Caplinger*, 21-cr-00342 (PLF), ECF 74 (D.D.C. August 1, 2022).[6]

Alternatively, if this Court were to impose a term of incarceration of 14 days or fewer, it could make that prison term a condition of probation pursuant to 18 U.S.C. § 3563(b)(10). Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at \*2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that

---

[6] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21-cr-620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21-cr-370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43  (same); *United States v. Cameron*, 22-cr-00017 (TFH) ECF 36 (D.D.C. Aug. 17, 2022) (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.  For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

**VI.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Pryer to one month of incarceration followed by three-year term of probation, sixty hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her ultimate acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:

/s/ *Matthew Moeder*
Matthew Moeder
Assistant United States Attorney
MO Bar No. 64036
400 East 9th Street, Room 5510
Kansas City, Missouri 64106
(816) 426-4103
Matthew.Moeder@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 9, 2022 I caused a copy of the foregoing opposition to be served on defense counsel of record via email.


*/s/ Matthew Moeder*

Matthew Moeder
Assistant United States Attorney